## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DONNA M. NICOSIA, Derivatively on Behalf of EXELON CORPORATION, | Case No. _____ |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| JOHN F. YOUNG, ANTHONY K. ANDERSON, LINDA JOJO, ANN C. BERZIN, PAUL L. JOSKOW, MAYO A. SHATTUCK III, LAURIE BRLAS, YVES C. de BALMANN, ROBERT J. LAWLESS, NICHOLAS DeBENEDICTIS, STEPHEN D. STEINOUR, RICHARD W. MIES, JOHN W. ROGERS, JR., CHRISTOPHER M. CRANE, JOSEPH DOMINGUEZ, ANNE PRAMAGGIORE, FRANK M. CLARK, THOMAS O'NEILL, FIDEL MARQUEZ, JOHN HOOKER, MICHAEL J. MADIGAN, MICHAEL F. McCLAIN, JAY DOHERTY, EDWARD MOODY, JUAN OCHOA, VICTOR REYES, and REYES KURSON LTD., | |
| Defendants, | |
| -and- | |
| EXELON CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

I. SUMMARY OF THE ACTION ................................................................. 1

II. JURISDICTION AND VENUE ............................................................. 3

III. PARTIES ................................................................................................ 4

    A. Plaintiff ................................................................................. 4

    B. Nominal Defendant ............................................................. 4

    C. Director Defendants ........................................................... 5

    D. Officer Defendants ............................................................. 6

    E. Third-Party Defendants ..................................................... 7

IV. COMED BRIBES MADIGAN TO ACHIEVE FAVORABLE LEGISLATION ............. 8

V. COMED ADMITS TO FAULT AND DOJ FINDS FAULTY INTERNAL CONTROLS THAT SHOW BREACHES OF FIDUCIARY DUTY ................................ 17

VI. DAMAGES TO THE COMPANY CONTINUE ............................. 20

VII. DERIVATIVE AND DEMAND REFUSED ALLEGATIONS ....................... 21

VIII. CLAIMS FOR RELIEF ........................................................................ 26

    COUNT I (Derivatively Against the Director Defendants for Breach of Fiduciary Duties by Failing to Conduct Oversight) ................................. 26

    COUNT II (Derivatively Against the Officer Defendants for Breach of Fiduciary Duty by Engaging in Illegal Conduct) ....................................... 28

    COUNT III (Derivatively Against Third-Party Defendants for Aiding and Abetting Breach of Fiduciary Duty) ........................................................ 30

    COUNT IV (Derivatively Against Individual Defendants for Unjust Enrichment) ..... 31

    COUNT V (Derivatively Against Director and Officer Defendants for Waste of Corporate Assets) ................................................................ 31

    COUNT VI (Derivatively Against Director and Officer Defendants for Violation of §14(a) of the Exchange Act) ...................................................... 32

    COUNT VII (Derivatively Against Director and Officer Defendants for Violation of §29(b) of the Exchange Act) ...................................................... 35

i

IX.     PRAYER FOR RELIEF ................................................................................................... 36

X.      JURY DEMAND ............................................................................................................... 36

Plaintiff Donna M. Nicosia ("Plaintiff"), by and through her attorneys, respectfully submits this Verified Shareholder Derivative Complaint for the benefit of Nominal Defendant Exelon Corporation ("Exelon" or the "Company"), against certain members of its, or its subsidiary, Commonwealth Edison Company ("ComEd"), Board of Directors (the "Board"), executive officers, and certain third parties (collectively, the "Individual Defendants"), seeking to remedy the Individual Defendants' breaches of fiduciary duties through lack of oversight over corruption issues and condoning or engaging in bribery and misleading statements made in the Company's proxy filings. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes the review and analysis of: (a) public filings made by Exelon with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by Exelon and other non-parties; (c) press releases, public letters, and other publicly disseminated information regarding investigations into the Company by the SEC; (d) the proceedings of a related pending securities fraud class action filed against the Company in this District, captioned *Flynn v. Exelon Corporation*, No. 1:19-cv-08209 (the "Securities Action"); (e) other publicly available information concerning Exelon and the Individual Defendants; and (f) documents produced in response to a books and records demand under 15 Pa. C.S.A. §1508.

## I. SUMMARY OF THE ACTION

1. This is a shareholder derivative action on behalf of Nominal Defendant Exelon, brought pursuant to 231 PA. CODE §1506.

2. Exelon is one of the largest electricity generation and distribution utilities in the country, providing electricity in the mid-Atlantic and Midwest. ComEd is one of Exelon's most significant subsidiaries, with the proof that Exelon and ComEd share the same headquarters.

3.     On July 17, 2020, the United States Attorney for the Northern District of Illinois, John R. Lausch, Jr. ("Lausch"), announced and filed in federal court a deferred prosecution agreement ("DPA") with ComEd, which revealed a years-long scheme where ComEd bribed Illinois House of Representatives Speaker Michael J. Madigan ("Madigan") in exchange for his support for favorable litigation.  The DPA announced that in exchange for deferring prosecution, ComEd would admit to the misconduct alleged herein, agree to pay a $200 million criminal penalty, and (along with Exelon) implement a set of corporate governance reforms.  The DPA states that ComEd had authority to enter the agreement from Exelon's Board.

4.     The course of conduct involved ComEd's former Chief Executive Officer ("CEO"), Anne Pramaggiore ("Pramaggiore"), who was promoted to become CEO of Exelon Utilities, as well as numerous other senior employees at ComEd.

5.     The bribes included committing to a minimum of 850 hours of billings to a law firm that supported Madigan politically, giving numerous make-work jobs at ComEd to numerous political supporters of Madigan, and even giving a ComEd Board seat with an annual pay of $78,000 to a Madigan supporter.  Madigan benefited from the political support that this system of patronage afforded him.

6.     ComEd, in turn, benefited from Madigan's support of two key pieces of legislation. The 2011 Energy Infrastructure and Modernization Act ("EIMA") helped ComEd determine how much revenue it could generate from the rates it charges, and the 2016 Future Energy Jobs Act ("FEJA") helped ComEd maintain a favorable regulatory process.  ComEd, under Pramaggiore, had at first tried to secure favorable legislation through traditional lobbying, rather than participating in Madigan's patronage system, which Pramaggiore's predecessor accommodated.

But when traditional lobbying did not work, Pramaggiore agreed to participate in this bribery scheme.

7.     Participation in illegal activities is always a breach of fiduciary duties.  And here, ComEd's participation in bribery, led by its officers, has cost it and Exelon dearly.  In addition to the criminal penalty levied in the DPA, ComEd, Exelon, and their directors and officers are currently facing numerous consumer and shareholder lawsuits, have likely spent at least tens of millions of dollars to respond to government inquiries and conduct internal investigations, and suffered reputational damage.

8.     And on a more personal level, numerous ComEd officials have pled guilty or have been criminally charged for their role in the bribery scheme.  Former ComEd lobbyist Fidel Marquez pled guilty and turned state witness.  In November 2020, Pramaggiore, her colleague, John Hooker, consultant, Jay Doherty, and lobbyist and former legislative colleague of Madigan, Michael F. McClain, were indicted, and they are currently on trial, for their roles in the bribery scheme.  In March 2022, Madigan was indicted and is awaiting trial to commence in April 2024.

## II.     JURISDICTION AND VENUE

9.     This Court has jurisdiction under 28 U.S.C. §1331.  The claims asserted herein arise under §§14(a) and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78cc(b), and Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.  In connection with the wrongdoing complained of herein, Defendants used the means and instrumentalities of interstate commerce, the U.S. mail, and the facilities of the national securities markets.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court has personal jurisdiction over each defendant named herein because each defendant is either an individual or corporation that has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  In addition, Nominal Defendant Exelon is incorporated in, maintains its principal executive offices in, and conducts business within, this District, through which the Individual Defendants had continuous and systemic contacts within this District.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because (i) Exelon is incorporated in this State; (ii) Exelon maintains it principal place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) the Individual Defendants have engaged in numerous activities that have had an effect in this District.

## III.   PARTIES

### A.   Plaintiff

12.     Plaintiff Donna M. Nicosia is an Exelon shareholder and has continuously held Exelon stock since at least May 2020.  Plaintiff will fairly and adequately represent Exelon's interests in this action.

### B.   Nominal Defendant

13.     Nominal Defendant Exelon is incorporated in Pennsylvania and headquartered at 10 South Dearborn Street, Chicago, Illinois, 60680.  It shares a headquarters with its subsidiary, ComEd.  Exelon is the largest provider of electricity in the country: in addition to being the dominant utility in Illinois through ComEd, it also supplies New Jersey, Pennsylvania, Delaware, Maryland, Virginia, and the District of Columbia through other subsidiaries.  Its business is in a

highly regulated industry, and as a result, its profits depend in large part on favorable legislation and regulations.

### C. Director Defendants

14. Defendant John F. Young ("Young") is the Chair of the Board since 2022 and a director since July 2018.

15. Defendant Anthony K. Anderson ("Anderson") has been a Board director since January 2013.

16. Defendant Linda Jojo ("Jojo") has been a Board director since September 2015.

17. Defendant Ann C. Berzin ("Berzin") was a Board director from 2012 to 2023. At the time she chose to not stand for re-election, she was the Chair of the Audit and Risk Committee.

18. Defendant Paul L. Joskow ("Joskow") was a Board director from 2007 to 2023.

19. Defendant Mayo A. Shattuck III ("Shattuck") was a Board director from 2012 to 2022. He was the chair of the Oversight Committee that oversaw the Company's response to the bribery investigation. He was also formerly Chair of the Board.

20. Defendant Laurie Brlas ("Brlas") was a Board director from 2018 to 2022.

21. Defendant Yves C. de Balmann ("de Balmann") was a Board director from 2012 to 2022.

22. Defendant Robert J. Lawless ("Lawless") was a Board director from 2012 to 2022.

23. Defendant Nicholas DeBenedictis ("DeBenedictis") was a Board director from 2002 to 2021.

24. Defendant Stephen D. Steinour ("Steinour") was a Board director from 2007 to 2020.

25.     Defendant Adm. (Ret.) Richard W. Mies ("Mies") was a Board director from 2009 to 2020.

26.     Defendant John W. Rogers, Jr., ("Rogers") was a Board director from 2000 to 2019.

27.     Defendants Young, Anderson, Jojo, Berzin, Joskow, Shattuck, Brlas, de Balmann, Lawless, DeBenedictis, Stenour, Mies, and Rogers are collectively referred to as the "Director Defendants."

**D.     Officer Defendants**

28.     Defendant Christopher M. Crane ("Crane") was the CEO of Exelon from 2012 to 2022.

29.     Defendant Joseph Dominguez ("Dominguez") was the CEO of ComEd from 2018 to early 2023.

30.     Defendant Anne Pramaggiore was the CEO of ComEd from 2011 to 2018 and then of Exelon Utilities from 2018 to October 2019, when she abruptly resigned in the midst of the ComEd-Madigan bribery investigation.  She is currently on trial for her role in the bribery scandal.

31.     Defendant Frank M. Clark ("Clark") was the CEO of ComEd from 2005 until 2011, when Pramaggiore succeeded him.

32.     Defendant Thomas O'Neill ("O'Neill") was the Chief Legal Officer and General Counsel of both Exelon and ComEd from 2017 to 2020.  Before he joined Exelon, he was a partner at Jenner & Block LLP, and he rejoined the firm after he retired from Exelon.

33.     Defendant Fidel Marquez ("Marquez") was a senior vice president of Government Affairs at ComEd from 2003 to 2019.  He has pled guilty to his role in the bribery scheme and has turned state witness.

34.     Defendant John Hooker ("Hooker") was the Executive Vice President of Government Affairs at ComEd and Exelon from 2004 to 2012, and afterwards, became a contract lobbyist for ComEd and Exelon.  He is currently on trial for his role in the bribery scandal.

35.     Crane, Dominguez, Pramaggiore, Clark, O'Neill, Marquez, and Hooker are collectively referred to as the "Officer Defendants."

### E.     Third-Party Defendants

36.     Michael J. Madigan was the Speaker of the Illinois House of Representatives from 1983 to 1995 and again from 1997 to 2021, for a total of 36 years.  Madigan induced ComEd to hire his supporters though they offered no or little value to ComEd, at total costs exceeding $1.3 million, as well as solicited campaign contributions from ComEd and Exelon that totaled hundreds of thousands of dollars per year, in exchange for his support for favorable legislation.

37.     Michael F. McClain ("McClain") was a ComEd contract lobbyist on a regular retainer until he formally retired in 2016, but he continued to consult or lobby for ComEd afterwards.  He also served in the Illinois House of Representatives alongside Madigan until he was defeated in his re-election bid in 1982.  In 2018 alone, he was paid $211,000 by ComEd, and he was likely paid millions of dollars by ComEd throughout his tenure and during the period of the bribery scheme.  He is currently on trial for his role in the bribery scandal.  He has also been indicted and faces trial for his role in Madigan's more-wide-ranging bribery scheme beyond ComEd's involvement.

38.     Jay Doherty ("Doherty") was a consultant for ComEd.  Fake work jobs routed through Doherty's consulting firm as subcontractors for ComEd cost the latter approximately $1.3 million.  He is currently on trial for his role in the bribery scandal.

39. Edward Moody ("Moody") was Madigan's precinct co-captain for his home base, the 13th Ward of Chicago. He has admitted to securing no to little work contracts paid by ComEd that have earned him more than $350,000 in total.

40. Defendant Juan Ochoa ("Ochoa") was a Board member of ComEd in 2018. Ochoa was appointed at the behest of Madigan, who wanted to reward him for his political loyalty. He earned $78,000 as his director retainer.

41. Victor Reyes ("Reyes") is the co-founder of Reyes Kurson Ltd.

42. Reyes Kurson Ltd. ("Reyes Kurson") is a law firm that had a contract with ComEd to be billed a minimum of 850 hours of work per year without regard to whether the company needed that level of legal service.

43. Madigan, McClain, Doherty, Moody, Ochoa, Reyes, and Reyes Kurson are collectively referred to as "Third-Party Defendants."

44. Director Defendants, Officer Defendants, and Third-Party Defendants are collectively referred to as the Individual Defendants.

## IV. COMED BRIBES MADIGAN TO ACHIEVE FAVORABLE LEGISLATION

45. For decades, Michael J. Madigan ruled Illinois politics as the Speaker of the Illinois House of Representatives. Madigan was an Illinois state representative from the 13th Ward of Chicago, and early in his political career, he was a protégé of long-time Chicago mayor and state Democratic party leader Richard J. Daley ("Daley"). Madigan was elected to the Illinois House of Representatives in 1970 and quickly rose through the ranks, becoming Speaker in 1983. Except for a short period from 1995-1997, he held onto the Speakership for more than three decades, becoming the longest serving legislative leader in the country.

46. Nicknamed the "Velvet Hammer," Madigan was soft-spoken but wielded political clout ruthlessly. Though he rarely asserted his power explicitly, he made it clear he was in charge,

describing in one call with his inner circle, "I understand we have a lot of people walking around trying to find things to complain about, but every once in a while, the speaker gets to do what he wants to do." Indeed, despite his relatively understated manner, according to a longtime ally, he still relied on "fear and intimidation." He put politics even before family, at one point opposing legislation his daughter, then-State Attorney General Lisa Madigan, supported.

47. Even when Madigan had people eased out, they remained loyal to him because they feared him. One such legislator, who was facing problematic sexual harassment allegations and was being told he needed to get out, reassured McClain he "would never do anything to damage my speaker."

48. Like Daley, Madigan was a master of using patronage to solidify political loyalty. Madigan got numerous jobs for his supporters. These jobs, often entailing little or no work, were Madigan's carrot and stick (with the implicit and sometimes explicit threat of withholding these jobs). Companies who needed legislative favors from Madigan were major sources of patronage and had the advantage of shifting payroll off government budgets.

49. One of the biggest sources of patronage was ComEd. As a utility, it was heavily regulated. The rates it charges need to be approved by state regulators and, ultimately, by the state legislature. At the same time, ComEd was the state's largest utility, so having approved savings or approved rate increases, even if small on a unit basis, were highly profitable in the aggregate. ComEd leaders have long had unspoken arrangements where they would provide jobs to Madigan's supporters, at Madigan's behest, in return for Madigan's support on favorable legislation. McClain, on a phone call, claimed that ComEd had been part of the "old-fashioned patronage system" and had been making hires to curry favor with political officials for decades,

dating back to hiring meter maids, and that the system evolved to be subcontractors because ComEd no longer had meter maids or similar jobs.

50.     The current scheme dates back to 2011.  At the time, ComEd came under new leadership, Anne Pramaggiore, who was at first reluctant to engage in patronage.  However, ComEd soon found that despite all the money and resources it spent on lobbying, it was getting nowhere with its legislative goals.  Pramaggiore then embraced the patronage game with gusto, and added a heaping of personal flattery.  She traveled with Madigan to Turkey on a trade trip to build a personal relationship, worked closely with ComEd lobbyist and Madigan associate, McClain, and called McClain and Madigan her "spirit guides."

51.     Specifically, what Pramaggiore agreed to do was to: (1) provide make-work jobs and internships to Madigan supporters, often through subcontractor arrangements with ComEd consultants; (2) retain the law firm of Victor Reyes, a Chicago firm called Reyes Kurson, and bill at least 850 hours per year to it, also as a political favor to Madigan; and (3) push for the appointment of Madigan ally Juan Ochoa to the ComEd board of directors.  In return, ComEd got Madigan's support for two statutes, which Madigan pushed through and saved ComEd more than $100 million.

52.     At the center of this scheme were ComEd executives and lobbyists and consultants: Pramaggiore, Hooker, Doherty, and McClain.  These so-called "ComEd Four" were indicted in November 2020 and are currently on trial for criminal bribery.

53.     McClain was the linchpin of the scheme because he acted as what ComEd employees called a "double agent" who could communicate back and forth ComEd and Madigan's needs.  McClain served with Madigan in the House until he lost his re-election campaign in 1982. Afterwards, he became a high-powered lobbyist due to his close association with Madigan.  His

value as a lobbyist was so great, and his connection to Madigan was so well-known, that at one point, Pramaggiore told him that his electoral loss "saved" ComEd because his subsequent work as a lobbyist helped to push through favorable legislation.

54.     McClain was also acutely aware that his value came from his ability to cater to Madigan's needs.   McClain told other lobbyists repeatedly that regardless of what company formally retained them, their "real client" was Madigan.   For example, in one call between McClain and a Madigan staffer, McClain expressly said, "My client is not ComEd [. . .] my client is the speaker[.]"

55.     McClain had regular conversations with Madigan, as well as Pramaggiore. Madigan and Pramaggiore rarely spoke together directly.  McClain instead acted as the consigliere in the Madigan gang.  McClain also had a habit of referring to Madigan by code, because he was concerned that third parties may be listening in on his conversations or reading his e-mails. Though he sometimes referred to the "speaker," at other times, he would obliquely refer to Madigan as "Our Friend," or "Himself," capitalized, as if Madigan were God.

56.     Also at the center of the scheme was ComEd executive and in-house lobbyist Fidel Marquez, who pled guilty to bribery and is cooperating with the authorities.  Because he was caught early in the investigation, he was able to record many conversations while wearing a wire.

57.     John Hooker, another former ComEd executive and in-house lobbyist, after his retirement, outside lobbyist for ComEd, was also central to this scheme because of his close relationships with McClain and other government officials.  He and McClain designed the "pass-through" subcontractor arrangement that was the centerpiece of the bribery scheme, where ComEd executives would arrange for jobs for Madigan supporters to be paid by ComEd as subcontracts

for consultants.  On a phone call played during the ComEd Four trial, Hooker and McClain were heard to brag about how they were the "masterminds" of this scheme.

58.    Jay Doherty, a politically connected consultant, provided a final piece for the scheme because his consulting outfit was the main firm that provided the make-work jobs. Doherty, as revealed in the ComEd Four trial, was not shy about pushing for reimbursement from ComEd, and he knew he would not be shortchanged because of how critical his patronage jobs (paid by ComEd) were to ComEd's legislative goals.

59.    And quarterbacking the whole scheme from ComEd was Pramaggiore, a former theater major from the Midwest.  Before this bribery scandal erupted, Pramaggiore was known for her community involvement and for her in-depth business knowledge.  But since this bribery scandal became public, people have learned that even for Pramaggiore, elbow grease is not enough; instead, she resorted to directing the greasing of palms.

60.    ComEd executives bribed Madigan to gain favorable legislative treatment.  The bribes took the form of wasting corporate resources by spending money on hires and retentions of people or businesses that Madigan favored.  In other words, ComEd acted as Madigan's personal patronage piggy bank.  These make-work jobs totaled more than $1.3 million in costs to ComEd.

61.    Madigan was actively involved in this scheme, and testimony from the ComEd Four trial show that with some insiders, he did not even bother creating a barrier that shielded him.  For his precinct co-captain, Ed Moody, he bestowed a $45,000-per year contract, paid through McClain, which was later upgraded to $4,500 per month under Doherty, paid by ComEd that required little to no work.  Instead, the job was a reward for Moody's foot-trooping for Madigan. According to Moody's testimony at the ComEd Four trial, Madigan told him, "I control that contract and if you stop doing political work, you'll lose that contract."  McClain reinforced that

message by telling Moody the contract was "a hell of a plum and that [Moody] owe[d] the speaker big." From 2012 to 2018, Moody worked that job and earned more than $350,000 in total from ComEd. ComEd later sponsored Moody for other subcontractor jobs through other consultants, with these private jobs only ending when Moody attained an elective office and it became impossible to pay him on the side because of the potential for bad optics.

62. Pramaggiore was the quarterback for this whole scheme. She made sure to tamp down resistance to the scheme from others at ComEd. She remained an active participant in the scheme after she was promoted to be CEO of Exelon Utilities. Marquez testified that Pramaggiore told him to tell her successor at ComEd, who was resisting subcontractor arrangements at Doherty's firm that ComEd paid for but did no work, to relay that ComEd was in the middle of a legislative battle and ComEd does not want to be in a "disruptive battle where, you know, somebody gets their nose out of joint, and we're trying to move somebody off, and then we get forced to give them a five-year contract because we're in the middle of needing to get something done in Springfield."

63. Similarly, Hooker warned that if Dominguez ended a subcontractor arrangement, Madigan would think: "You're not going to do something for me, I don't have to do anything for you."

64. Doherty was happy to keep taking ComEd's money and be the funnel for these contracts. When Marquez, wearing a wire, asked Doherty about the value of these arrangements for ComEd, he told Marquez, "if it ain't broke, don't fix it" because the "money comes from Springfield." He also acknowledged that subcontractors paid by ComEd did not do any real work but knew when to "keep their mouth shut."

13

65.     McClain, as the main point person for patronage, also pushed for ComEd to directly hire Madigan supporters as interns or even as full-time employees.  McClain sometimes pushed for wholly unqualified candidates.  For instance, one such candidate he pushed for was to be placed in ComEd's legal department, but not be counted as one of six summer job slots that were set aside for Madigan's preferred candidates, because even though "He will not learn very much, and he will not be able to contribute much, if anything, but that is still the ask."  Another candidate, who ComEd ultimately could not hire as a summer intern, fell so far below ComEd's stated minimum grade-point-average qualification, earning a 1.1 in college, that even McClain was taken aback. Although he at first pushed for her, when he learned about her grades, he exclaimed in an e-mail, "Holy Mackerel.  Even mine were higher than that number!!!!!!!!"

66.     O'Neill, Exelon and ComEd's then chief legal officer and general counsel, testified to how McClain pressured him and others at ComEd to give legal work to other Madigan supporters.  In 2017, Pramaggiore sought his feedback about hiring Will Cousineau ("Cousineau"), one of Madigan's long-time political directors, and Pramaggiore "communicated to [O'Neill] that she felt it was important for the speaker."  Pramaggiore reinforced that essentially, "What's important to the speaker is important to ComEd."

67.     O'Neill bore the brunt of the pressure regarding another piece of the scheme, which was the forced retention of Reyes Kurson.  He testified to the "relentless" pressure he was given to direct work to that firm.  He would get that pressure directly from McClain, to the point where O'Neill thought McClain was a "pest."  The contract was unusual because it guaranteed a minimum number of hours per year – 850 billable.  He understood that the primary reason for guaranteeing 850 hours to Reyes Kurson was not based on ComEd's legal needs, but rather because it was important to Madigan.  And in the midst of a push to get FEJA passed, which would renew

14

favorable rates for ComEd, in 2016, O'Neill received so many e-mails regarding the Reyes Kurson billable guarantee that he thought it was "odd the speaker would pay such close attention to this contract[.]" O'Neill was particularly unhappy about the insistence to retain Reyes Kurson because Victor Reyes already had a consulting contract with ComEd for his outfit, the Roosevelt Group. O'Neill thought Reyes was "double dipping."

68.     When ComEd officials resisted renewing the contract for 850 hours per year because of a lack of work, McClain stepped in to put ComEd in its place. McClain wrote to Pramaggiore, "I am sure you know how valuable [Reyes] is to our Friend. I know the drill and so do you. If you do not get involve[d] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you. Is this a drill we must go through?" The contract was renewed after Pramaggiore personally intervened.

69.     Finally, McClain pressed Pramaggiore heavily on the appointment of Madigan supporter Juan Ochoa to ComEd's board. O'Neill was concerned about the "optics" of Ochoa's appointment – his closeness to the speaker, his reputational hit from having taken an appointment from Rod Blagojevich, and his personal financial troubles. None of these were issues for Madigan, however. Madigan told McClain that personal financial problems were not disqualifying, remarking that Harry Truman had also gone through personal bankruptcy. Madigan also joked that he should be taking the board seat for himself, after learning from McClain that it paid $78,000 per year.

70.     When faced with resistance to Ochoa's appointment, Pramaggiore reassured McClain, "You take good care of me, and so does our friend [Madigan], and I will do the best I can do to, to take care of you." She promised to "keep pressing." Though the effort took over a year, eventually, Pramaggiore was able to get Ochoa appointed to the ComEd board.

71.     The ComEd Four trial also showed that it was not merely ComEd, the subsidiary, that curried favor with Madigan, but Exelon as well.  In one recorded call between McClain and Marquez, McClain mentioned that in talking to the "speaker," he brought up bills where "Exelon Generation wants to do something" and needed to know who was the "point person" to talk to.  He asked who was going to "drive the bus."  McClain emphasized that the point person would need to be "discrete" and speak in "code."  Moreover, the point person would preferably be a contract lobbyist rather than an employee of ComEd or Exelon: "it's gotta be an agent."  Cousineau was mentioned as a possibility, and McClain said he was "mentoring him" but did not think he was "ready."  Pramaggiore, by then Exelon Utilities CEO, recommended that the point person be either Hooker or McClain because they were "seasoned."

72.     The trial even came out with examples of explicit bribes where ComEd had to commit to campaign contributions for Madigan to get his help, an explicit quid pro quo.  In August 2016, McClain informed Marquez, "Our friend called yesterday and asked if I would increase the request from Exelon/ComEd from $250k to three times what they did last year, so it would be close to $450k."  This was when ComEd was lobbying for the passage of FEJA, which with Madigan's help did pass at the end of 2016.

73.     Moreover, McClain spoke of a "magic list" where contributions helpful to or directly to Madigan would be recorded, which consists of a group of lobbyists and other Madigan supporters.  And indeed, the government had found when they raided McClain's home a "Magic Lobbying List" that referred to these persons.  This handwritten list was referred to by the government.



74.     This scheme continued for years, and only came to an end when federal authorities

closed in with criminal charges.  The damages are still felt by ComEd to this day.

## V.     COMED ADMITS TO FAULT AND DOJ FINDS FAULTY INTERNAL CONTROLS THAT SHOW BREACHES OF FIDUCIARY DUTY

75.     On July 17, 2020, Lausch announced and filed a DPA where ComEd admitted to

the bribery scheme, paid a $200 million penalty, and (along with Exelon) committed to enacting

corporate governance reforms.

76.     The DPA detailed that the misconduct was not just at the individual employee level,

but also involved the failure of controls at the corporate level.  The DPA observed that Exelon's

Code of Conduct, which binds ComEd's employees and agents, expressly required them to:

"[k]eep accurate and complete records so all payments are honestly detailed and company funds

are not used for unlawful purposes"; "[c]onduct due diligence on all potential agents, consultants

or other business partners"; and "[n]ever use a third party to make payments or offers that could

be improper."  Also, the Exelon Code of Conduct prohibited bribery, which included "Providing something of value for the benefit of a public official in a position to make a decision that could benefit the company."  These internal controls, however, failed, because ComEd executives were able to sneak through and get payments approved for subcontractors who did little or no work for ComEd or Exelon, all for the purpose of politically benefiting Madigan so that he would decide to support favorable legislation for ComEd.  These payments were falsely recorded as "consulting" payments – which imply they are for ComEd's benefit – but in reality, were done to secure these persons' loyalty to Madigan.  Furthermore, ComEd hired many of Madigan's political workers from his home base in Chicago's 13th Ward as interns, even when the interns failed to meet ComEd's hiring standards.  In one phone call played at trial, McClain explained that one proposed intern's college GPA of 1.1 was even worse than his own college grades.

77.     ComEd had the same internal control failures when it came to rewarding Madigan's favored law firm, which at trial was revealed to be Reyes Kurson, by guaranteeing 850 hours of billable work to it, which at least sometimes involved fake work that was of no value to ComEd or Exelon but were merely done because Madigan insisted on having that much work for the firm.

78.     ComEd's Board even approved a director appointment not because of the director's merits – because his appointment was initially resisted heavily internally and was delayed by over a year – but because Madigan insisted on rewarding him with that position.

79.     ComEd and Exelon also implemented a new compliance program as part of the DPA, which implied that its compliance program was grossly deficient before.  In particular, the new compliance requirement would require direct Exelon Board oversight, which implies that contrary to their fiduciary duties, the Exelon directors had actually failed to conduct any oversight

before then. Board-level oversight implemented under the DPA includes reports by senior executives to ComEd and Exelon's boards of directors.

80.     As part of the DPA, ComEd was also required to "develop and promulgate a clearly articulated and visible corporate policy against violations of U.S. law, which policy shall be memorialized in a written compliance code." This implies, alarmingly, that ComEd did not have such a policy, even though it is concerning basic oversight by the Board. But the fact that ComEd had to be ordered to write up such a policy anew implies that the Board never implemented or approved such a policy before.

81.     ComEd was also required to "ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts." This implies that this sort of basic internal accounting system was not monitored or even implemented before the DPA.

82.     Furthermore, ComEd was required to develop policies and procedures to ensure that there would be periodic risk assessments on at least an annual basis. This implies that such regular assessments were not implemented before this DPA.

83.     Furthermore, ComEd was specifically instructed to "assign responsibility to one or more senior corporate executives of ComEd or Exelon" for implementing this compliance system and to "have the authority to report directly to independent monitoring bodies," including ComEd and Exelon's boards. This implies that the Exelon and ComEd boards did not have such systems before.

84.     ComEd was also required to implement training and communication of compliance systems to "all directors, officers, employees, and, where appropriate, agents and business partners

including consultants and lobbyists." Similarly, ComEd was required to implement internal reporting and investigative processes, as well as enforcement and discipline processes.

85.     To ensure ComEd would actually make good on these reforms, the DPA required it to report in writing to the U.S. Attorney's Office for the Northern District of Illinois on its progress at least once per year for three years in a row.

## VI.     DAMAGES TO THE COMPANY CONTINUE

86.     Damages to the Company include $200 million in a criminal penalty, the costs of reforms, which judging by the extent to which they are described in the DPA and which indicates that a foundation of compliance needs to be built up from the ground up will cost millions or tens of millions of dollars, possibly tens of millions of dollars in legal costs, and a securities lawsuit with potentially hundreds of millions of dollars in damages, mean that the monetary hit to the Company well exceeds $200 million.

87.     More importantly, the bribery scandal has led to a huge reputational hit for the Company and for Exelon as a whole and for its leadership.

88.     These reputational hits keep coming because of the current bribery trial of the ComEd Four that is expected to last two months. This will be followed by Madigan's trial next year.

89.     Furthermore, ComEd's long-term business interests are now impaired because officials will bend over backwards to not look like they are favoring the Company. This will mean that ComEd's legitimate legislative concerns will go unaddressed for years to come, leading to the long-term impairment of the business due to how heavily regulated ComEd is as a utility business.

## VII.    DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

90.    Plaintiff brings this action derivatively in the right of, and for the benefit of, Exelon to redress injuries suffered, and to be suffered, by Exelon as a direct result of the breaches of fiduciary duty by the Individual Defendants.

91.    Exelon is named as a Nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiff is, and at all times relevant hereto, has been, a continuous shareholder of Exelon.

92.    Plaintiff will adequately and fairly represent the interests of Exelon and its shareholders in prosecuting and enforcing their rights.  Prosecution of this action, independent of the Board, is in the best interests of the Company.

93.    The wrongful acts complained of herein subject, and will continue to subject, Exelon to ongoing harm because the adverse consequences of the actions are still in effect and ongoing.

94.    On February 22, 2023, Plaintiff sent a litigation demand letter to the Board of Exelon.  Subsequently, on March 10, 2023, Plaintiff sent a books and records demand letter to the Board (the "Demand Letter").  Through the Demand Letter, Plaintiff demanded that the Board take the following actions:

a.    Appoint a special litigation committee of independent directors (the "SLC") to investigate the matters set forth therein and institute legal action for damages against all responsible officers, directors, and third parties, if such legal action is in the best interests of the Company;

b.    Empower, by Board resolution, the SLC to hire financial, legal, and other advisors as the SLC deems reasonably necessary to fulfill its investigatory role;

c.     Empower, by Board resolution, the SLC to take such independent action as it deems appropriate under the circumstances, including prosecution of litigation or other disciplinary action, such as compensation penalties, against the directors and officers who are liable for oversight failures, misleading statements, or other misconduct;

d.     Reform the Company's bonus claw back policy to permit claw back of executive discretionary bonus compensation when the executive is found to have made false statements concerning the Company's financial statements or breaches their fiduciary duties of loyalty and good faith;

e.     Strengthen independence requirements for directors by ensuring that independent directors are not former employees of Exelon or its subsidiaries;

f.     Refresh the Board to ensure: (1) replacement of two of its current directors with a new independent director; or (2) addition of two additional new independent directors to the Board;

g.     Offer robust tenure protection for the new independent directors by allowing their dismissal during their first term only for mis-, mal-, or nonfeasance based on a reasonable investigation and vote of a majority of the independent directors;

h.     Ensure diversity through committing to interview at least one female and one minority candidate for every open Board vacancy; and

i.     Create a sub-committee of the Board ("Board sub-committee") comprised of a majority of independent members, with appropriate advisors, or an independent council of advisors, charged with overseeing corporate governance reforms put into place in response to this Demand and: (1) permit the Board sub-committee to meet in executive session without

management; and (2) require the Board sub-committee to report periodically to the Board regarding the reforms.

95. As the Company disclosed in the first quarter of 2021 in its SEC filings, the Board formed a SLC in response to several litigation demands. Though it has been over two years since the SLC was formed, the Company has not reported any results for its investigation.

96. ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████

97. ███████████████████████████████████████████████
███████████████████████████████ ████████████████
███████████████████████████████████████████████
████████████████████ ████████████████████

98. ███████████████████████████████████████████████
███████████████████████████████ ████████████████
████████████████ █████████████████████████████████
████████

99. ███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████████ ████
███████████████████ ██████ ███████████████████████
████████████████████████████ ██████████████████████



100.

101.

102.



103.

104.

105.

25

106. 

107. The Company's Board has not, to date, responded to the Demand Letter. Nor has the Company provided any public disclosures in its SEC filings concerning the purported investigation of the SLC.

Therefore, pursuant to 15 PA. CONST. STAT. §1781(a)(1), Plaintiff may maintain this action to enforce the rights of the Company.

## VIII. CLAIMS FOR RELIEF

### <u>COUNT I</u>
**(Derivatively Against the Director Defendants for Breach of Fiduciary
Duties by Failing to Conduct Oversight)**

108. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

109. Each Director Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Exelon's business and affairs.

110.     Each of the Director Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

111.     The Director Defendants' conduct set forth herein was due to their bad-faith complete failure to implement any oversight system that would have monitored and potentially caught the bribery that cost the Company more than $1 million over a decade and now hundreds of millions of dollars from the fallout of getting caught.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

112.     In breach of the fiduciary duties they owed to Exelon, the Director Defendants willfully or recklessly made and/or caused the Company to make the false and misleading statements of material fact and material omissions alleged herein.

113.     The Director Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact alleged herein.

114.     In further breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of internal controls over financial reporting.

115.     The Director Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and/or omitted material statements, and they failed to correct the Company's false and misleading statements and/or omissions of material facts. The Director Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

116.     The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to

maintain internal controls. The Director Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.

117.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

118.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary duties, Exelon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT II
### (Derivatively Against the Officer Defendants for Breach of Fiduciary Duty by Engaging in Illegal Conduct)

119.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

120.    Each Officer Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Exelon's business and affairs.

121.    Each of the Officer Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

122.    The Officer Defendants' conduct set forth herein was due to their bad-faith complete failure to implement any oversight system that would have monitored and potentially caught the bribery that cost the Company more than $1 million over a decade and now hundreds of millions of dollars from the fallout of getting caught. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

123. In breach of the fiduciary duties they owed to Exelon, the Officer Defendants willfully or recklessly made and/or caused the Company to make the false and misleading statements of material fact and material omissions alleged herein.

124. The Officer Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact alleged herein.

125. In further breach of their fiduciary duties, the Officer Defendants failed to maintain an adequate system of internal controls over financial reporting.

126. The Officer Defendants also actively engaged in, or directed bribery in, violation of Federal bribery statutes, which also constitutes an intentional breach of fiduciary duties.

127. The Officer Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and/or omitted material statements, and they failed to correct the Company's false and misleading statements and/or omissions of material facts. The Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

128. The Officer Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Officer Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of manipulating Exelon's EPS.

29

129.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

130.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary duties, Exelon has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

**COUNT III**
**(Derivatively Against Third-Party Defendants for Aiding and**
**Abetting Breach of Fiduciary Duty)**

131.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132.    The Third-Party Defendants engaged in and directed the bribery scheme, in violation of federal bribery statutes.

133.    The Third-Party Defendants directed ComEd and Exelon officers to engage in bribery, in violation of federal bribery statutes.

134.    The Third-Party Defendants, as sophisticated actors with an understanding of the legal system, also knew that when they directed Exelon and ComEd officers to violate the law by engaging in bribery, they were causing Exelon and ComEd officers to violate their fiduciary duties to Exelon and ComEd.

135.    As a result, the Third-Party Defendants intentionally and substantially participated in causing Exelon and ComEd officers in breaching their fiduciary duties, and, therefore, were aiding and abetting these breaches of fiduciary duties.

136.    As a direct and proximate result of the Third-Party Defendants aiding and abetting breaches of the Officer Defendants' fiduciary duties, Exelon has sustained, and continues to sustain, significant damages.  As a result of the misconduct alleged herein, the Third-Party Defendants are liable to the Company.

## COUNT IV
### (Derivatively Against Individual Defendants for Unjust Enrichment)

137.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

138.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Exelon.

139.    The Individual Defendants either benefitted financially from the improper conduct, including through insider sales, or received bonuses, stock options, or other similar compensation from Exelon as a result of the bribery scandal or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, including accepting or directing bribes.

140.    Plaintiff, as a shareholder and representative of Exelon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT V
### (Derivatively Against Director and Officer Defendants for Waste of Corporate Assets)

141.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Director and Officer Defendants have caused Exelon to waste valuable corporate assets, incurring many millions of dollars conducting the internal investigation, defending against regulatory investigations, paying the $200 million criminal

penalty, and defending against other civil lawsuits. Moreover, Exelon has suffered, and continues to suffer, significant reputational and economic damage.

143. As a result of the waste of corporate assets, the Director and Officer Defendants are each liable to the Company.

## COUNT VI
### (Derivatively Against Director and Officer Defendants for Violation of §14(a) of the Exchange Act)

144. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

145. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

146. The Director Defendants exercised control over the Company and caused it to disseminate a false and misleading Proxy Statement on March 17, 2021 (the "2021 Proxy Statement"). The 2021 Proxy Statement materially misrepresented the Company's strength of internal controls and omits facts tending to show systematic involvement in the corruption scandal alleged herein. The 2021 Proxy Statement claims that the misconduct was "taken by a small number of former ComEd executives[.]" However, the 2021 Proxy Statement omits the findings of the DPA and the allegations in subsequent indictments of the ComEd Four and the Madigan indictment that tend to show that Exelon itself had inadequate internal controls that failed to detect, among other things: the presence of false subcontractor payments that were in reality bribes but

were recorded as consulting subcontracts; the hiring of make-work interns who did not meet ComEd's qualifications, but were only retained at Madigan's behest; and excessive billing to Victor Reyes' affiliated companies to curry political favor rather than obtain substantive benefits. For the same reasons, ComEd and the Company's books and records were inaccurate because they incorrectly recorded payments as purportedly legitimate business expenses when they were, in reality, bribes. Moreover, the 2021 Proxy Statement omits any mention of the material fact that Exelon's Chief Legal Officer, Thomas O'Neill, personally knew about and approved at least some of these improper payments.

147. The Director Defendants exercised control over the Company and caused it to disseminate a false and misleading Proxy Statement on March 16, 2022 (the "2022 Proxy Statement"). The 2022 Proxy Statement omits any mention of the Company and its agents' misconduct, except to refer to an SEC subpoena seeking information relating to the conduct that led to the DPA. The 2022 Proxy Statement omits the findings of the DPA and the allegations in subsequent indictments of the ComEd Four and the Madigan indictment that tend to show that Exelon itself had inadequate internal controls that failed to detect, among other things: the presence of false subcontractor payments that were in reality bribes but were recorded as consulting subcontracts; the hiring of make-work interns who did not meet ComEd's qualifications but were only retained at Madigan's behest; and excessive billing to Victor Reyes' affiliated companies to curry political favor rather than obtain substantive benefits. For the same reasons, ComEd and the Company's books and records were inaccurate because they incorrectly recorded payments as purportedly legitimate business expenses when they were, in reality, bribes. Moreover, the 2022 Proxy Statement omits any mention of the material fact that O'Neill personally knew about and approved at least some of these improper payments.

148.     The Director Defendants exercised control over the Company and caused it to disseminate a false and misleading Proxy Statement on March 15, 2023 (the "2023 Proxy Statement"). The 2023 Proxy Statement omits any mention of the Company and its agents' misconduct, except to refer to an SEC subpoena seeking information relating to the conduct that led to the DPA and to how the fine led to a reduction in the then CEO Crane's compensation. The 2023 Proxy Statement omits the findings of the DPA and the allegations in subsequent indictments of the ComEd Four and the Madigan indictment that tend to show that Exelon itself had inadequate internal controls that failed to detect, among other things: the presence of false subcontractor payments that were in reality bribes but were recorded as consulting subcontracts; the hiring of make-work interns who did not meet ComEd's qualifications but were only retained at Madigan's behest; and excessive billing to Victor Reyes' affiliated companies to curry political favor rather than obtain substantive benefits. For the same reasons, ComEd and the Company's books and records were inaccurate because they incorrectly recorded payments as purportedly legitimate business expenses when they were, in reality, bribes. Moreover, the 2023 Proxy Statement omits any mention of the material fact that O'Neill personally knew about and approved at least some of these improper payments. Furthermore, the 2023 Proxy Statement omits any mention of Crane's own role in the misconduct, instead going out of the way to give the misleading impression that Crane acted completely appropriately, despite the reduction in compensation. Specifically, the 2023 Proxy Statement misleadingly states, "At the end of the year, we bid farewell to president and CEO Chris Crane. We thank him for his vision, which led to where we are today and set the new Exelon up for success."

149.     As stated herein, these Proxy Statements contained untrue statements of material facts and omitted material facts necessary to make the statements that were made not false and

misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9, promulgated thereunder. These false statements and omissions were essential links in the re-election of each of the directors, formed the basis of the Company's shareholders' "say-on-pay" vote, and formed the basis of the ratification of the Company's auditor, and the continued mismanagement of Exelon.

150.    The written communications made by the Director Defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent, reckless, or fraudulent manner.

151.    At all relevant times to the dissemination of the materially false and/or misleading Proxy Statements, the Director Defendants were aware of, and/or had access to, the facts concerning Exelon and ComEd's misconduct.

152.    Exelon, as a result, has been injured by this conduct and is entitled to damages and equitable relief.

### COUNT VII
**(Derivatively Against Director and Officer Defendants for
Violation of §29(b) of the Exchange Act)**

153.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.    The Director Defendants each received incentive compensation and fees, including stock awards, while engaged in conduct that violated §14(a) of the Exchange Act. The Director Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because these Defendants violated §14(a) by issuing false and misleading reports to Exelon shareholders regarding the nature of, and responsibility for, violations of federal law and regulations. All of the payments the Director Defendants received are therefore voidable by Exelon under §29(b) of the Exchange Act.

155.    Exelon is in privity with the Director Defendants with respect to the incentive compensation and fees provided by Exelon to these Defendants.  The Director Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

156.    Exelon has been severely injured by the misconduct of the Director Defendants. Accordingly, Exelon is entitled to damages, *i.e.*, recission of the incentives, compensation, and fees granted to the Director Defendants.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Exelon, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties to Exelon;

C.    Directing the Individual Defendants, jointly and severally, to account for all losses and/or damage sustained by Exelon by reason of the acts and omissions complained of herein, together with pre-judgment and post-judgment interest;

D.    Awarding Exelon restitution from the Individual Defendants, and each of them;

E.    Awarding Plaintiff's attorneys' fees, expert fees, and other costs, expenses, and disbursements of this action; and

F.    Granting such other and further relief as the Court may deem just and proper.

## X.    JURY DEMAND

157.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

Dated: April 26, 2023

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/ Jing-Li Yu*
Jing-Li Yu (N.D. Ill. Bar No. 4934436)
Donald A. Broggi
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
E-mail: jyu@scott-scott.com
   dbroggi@scott-scott.com

Geoffrey M. Johnson (N.D. Ill. Bar No. 0073084)
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile: (860) 537-4432
E-mail: gjohnson@scott-scott.com

*Attorneys for Plaintiff Donna M. Nicosia*

**THE LAW OFFICES OF MICHAEL M. MULDER**
Michael M. Mulder (N.D. Ill. Bar No. 1984268)
Elena N. Liveris (N.D. Ill. Bar No. 6297048)
1603 Orrington Ave., Suite 600
Evanston, Illinois 60201
Telephone: (312) 263-0272
Facsimile: (312) 263-2942
E-mail: mmulder@mmulderlaw.com
   eliveris@mmulderlaw.com

*Local Attorneys for Plaintiff Donna M. Nicosia*

## <u>VERIFICATION TO SHAREHOLDER DERIVATIVE COMPLAINT</u>

I, Donna M. Nicosia, hereby declare and verify that I am a shareholder of Exelon Corporation as alleged in the attached Shareholder Derivative Complaint ("Complaint"). I have reviewed the Complaint and authorized its filing on my behalf. I verify that as to those allegations in the Complaint of which I have personal knowledge, I believe those allegations to be true to the best of my knowledge, information, and belief. As to those allegations in the Complaint of which I do not have personal knowledge, I believe those allegations to be true, based on the discussions with and reliance upon my counsel and to the best of my knowledge, information, and belief.

I have not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to me; or (ii) reimbursement, by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 04 / 25 / 2023 ___, 2023

*Donna M. Nicosia*
Donna M. Nicosia

1

Doc ID: 622f4c7f034bebd1ace99509171df78fcf613259